## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Moneva Walker, *et al.*,                                        Case No. 3:20-cv-02176

        Plaintiffs,

    v.

Cedar Fair, L.P., *et al.*,                                        **ORDER**

        Defendants.

This class action lawsuit arises out of the wholly cancelled or otherwise abbreviated 2020 season at eleven of Defendants Cedar Fair, L.P. and Cedar Fair Management, Inc.'s thirteen amusement parks.[1] The eleven parks are: Cedar Point, Carowinds, Dorney Park, California's Great Adventure, Knott's Berry Farm, Kings Dominion, Kings Island, Michigan's Adventure, Valleyfair, Worlds of Fun, and Canada's Wonderland.

Plaintiffs, the putative class members, purchased season passes at Defendants' parks promising "unlimited visits" for the 2020 season. (Doc. 76, PgID. 1021). Plaintiffs demand compensation for themselves and other similarly situated persons for the partial and/or complete closure of Defendants' amusement parks due to the COVID-19 pandemic.

Before me is Plaintiffs' motion for class certification. (Doc. 76, 77 (sealed)). Defendants opposed the motion (Doc. 105 (106 sealed)), Plaintiffs filed a reply (Doc. 112), and Defendants filed a sur-reply (Doc. 116).

---

[1] Plaintiffs agreed to withdraw their claims related to two parks: Schlitterbahn New Braunfels and Schlitterbahn Galveston. (Doc. 112, PgID. 1993–94). They agreed to do so after Defendants explained that the purchasing software used on their websites for the Schlitterbahn parks was "not under the Cedar Fair umbrella until late 2020." (Doc. 105, PgID. 1638). Accordingly, when I refer to Defendants' "parks," I refer only to the eleven listed above.

For the reasons that follow, I grant Plaintiffs' motion for class certification. I exercise my discretion to modify Plaintiffs' proposed class definitions. *See Powers v. Hamilton Cnty. Pub. Def. Comm'n,* 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions ..."). Additionally, the Federal Rules of Civil Procedure grant me broad discretion to divide a class into sub-classes. *See* Fed. R. Civ. P. 23(c).

I certify the following two classes and sub-classes:

1. **Ohio Consumer Protection Class.** This class asserts an Ohio Consumer Practices Act ("OCSPA") claim. This claim alleges that Cedar Fair's ads failed to comply with Ohio law relative to notice of exclusion and disclaimers.[2]

   As a result of limited access due to COVID-19 related shutdowns, a 2020 unlimited season pass purchaser would have expected a refund of the difference between the pass price of the 2020 expected season and the value of the 2020 season the purchaser actually received.

   The OCSPA sub-classes are: (a) Regular Summer/Season Pass holders to any single park, with or without any "add-ons;"[3] (b) Gold Pass holders to any single park, with or without any add-ons; and (c) Platinum Pass holders, which I further describe below and sometimes refer to as "multi-park passholders," with or without any add-ons.

2. **Equitable Claims Class.** This class asserts unjust enrichment and money had and received claims on behalf of passholders to parks that never opened in 2020. These parks are California's Great America, Canada's Wonderland, and Valleyfair. The claims allege that it was unjust for Cedar Fair to take the money that passholders paid for 2020 passes but provide no bargained-for

---

[2] As I have explained in previous Orders, if a consumer wanted to read Defendants' terms and conditions of purchase, they had to first click on the "Terms & Conditions" link (the first click). *See Walker v. Cedar Fair, L.P.*, No. 3:20-cv-02176, 2024 WL 1580109, --F. Supp. 3d-- (N.D. Ohio Apr. 11, 2024) ("*Cedar Fair I*"); *and see Walker v. Cedar Fair*, No. 20-176, 2024 WL 301284, -- F. Supp. 3d -- (N.D. Ohio, June 14, 2024) ("*Cedar Fair II*"). That link was not highlighted or differentiated from the other surrounding text in a way that would indicate that the hyperlink even existed.

After the first click, consumers were brought to a page where they could elect to click on various topics from a list of "quick links." *See Cedar Fair I, supra*, 2024 WL 1580109. Only after clicking one of those links (the second click) could he or she see the text of the term and condition of his or her choice. *Id.* I have held that the "double click" requirement violated the OCSPA. *Id.*

[3] "Add-ons" refers to the various options for which season pass purchasers could (for additional payment) add optional benefits: *i.e.*, dining discounts, drink refills, and access to priority "Fast Lanes." (*See* Doc. 76, PgID. 1019, fn. 5).

consideration in return. Plaintiffs in this class, where parks were completely closed, would be entitled to a full refund.

The Equitable Claims sub-classes are: (a) Summer/Season Pass holders to California's Great America, Canada's Wonderland, or Valleyfair park, with or without any add-ons; and (b) Gold Pass holders to California's Great America, Canada's Wonderland, or Valleyfair park, with or without any add-ons. Platinum pass purchasers are excluded from this class.

To qualify for inclusion in both classes, passholders must have purchased their 2020 season passes via one of Defendants' parks' websites before March 13, 2020, which is the date that Defendants announced that the pandemic would close parks.

The Consumer Protection Class and sub-classes are certified without regard to whether, or how many times, the passholders used their passes in 2020. Actual usage is irrelevant to the measure of damages. The benefit acquired by purchase of a pass was each passholder had unlimited access to the park (or parks) for the entire 2020 season.

Upon purchase, the passholder had the right to go as often as he or she desired—up to and including whenever, throughout the season, the park was open. That is the option that Defendants made available. Namely: Defendants had to permit the passholder to come to the park(s) as the passholder desired.

Both classes also include any passholders who obtained their 2020 season pass before December 31, 2019, regardless of whether they used their 2020 pass to access a park during the 2019 operating season.

As an inducement to purchase unlimited 2020 season passes, Defendants permitted purchasers, who made their purchases during late 2019, to access Defendants' parks for the remainder of the 2019 season. Those passholders who purchased their 2020 unlimited season pass in 2019 received a benefit: reduced cost of their 2020 pass. And Defendants benefitted from "early birds" also: they received revenue for the 2020 season in advance of the 2020 operating season.

3

This 2019 access was a gratuity that Defendants gave to "early bird" purchasers. That option, however, did not alter the nature of the underlying and applicable bargain—namely unlimited access during the 2020 season.

Whether a 2020 passholder in either class exercised their ability to access a park in 2019 is immaterial. The benefit those Plaintiffs were purchasing was 2020 unlimited access. That is the subject of this lawsuit and that is the only appropriate focus of this class certification Order.

Likewise, Plaintiff Mori's decision to purchase her pass on October 11, 2019 and use it the next day does not disqualify her from acting as a class representative for the Equitable Claims Class. The park she purchased a 2020 unlimited season pass for—California's Great America— never opened in 2020.

Both classes include so-called "Easy Pay" participants, so long as the passholder made full payment on his or her 2020 season pass or passes. "Easy Pay" is Defendants' nomenclature for purchasers who chose to pay for their passes in installment payments. (*See* Doc. 106 *SEALED* PgID. 1910). Defendants paused Easy Pay installment payments during the COVID-19-mandated park closures. However, Defendants automatically resumed billing when the parks reopened.

Thus, Easy Pay consumers, too, paid Defendants' full pass price for the 2020 season as originally promised, and instead, received something less.

I am not now persuaded that "Easy Pay" consumers should be treated any differently from other consumers who did not elect "Easy Pay." Rule 23(c)(1)(C), however, authorizes me discretion to amend or alter this decision— *i.e.*, to create a sub-class or sub-classes of Easy Pay consumers— if appropriate, at a later date. In other words, the measure of damages for Easy Pay

4

customers is the total amount that they paid—*i.e.*, inclusive of any additional payment that Easy Pay purchasers may have incurred for selecting that option.[4]

The following exclusions apply: (1) any 2020 unlimited season passholder who received a refund; (2) any passholder who used his or her 2020 season pass at any time, and for any reason, during Defendants' 2021 operating season; (3) any Judge or Magistrate Judge presiding over this action and the members of their family; (4) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and their current employees, officers and directors; (5) persons who properly execute and file a timely request for exclusion from the class; (6) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (7) Plaintiffs' counsel and Defendants' counsel; (8) the legal representatives, successors, and assigns of any such excluded persons. (Doc. 76, PgID. 1019, fn. 1).

In sum: the benefit of the bargain was the passholder's opportunity to use his or her pass(es) at will for unlimited entry during the 2020 season at the passholder's option. The extent to which a passholder could not exercise that option, due to COVID-19 compelled closure in the 2020 season, is therefore the measure by which damages are calculated. For the Consumer Protection Class, it is irrelevant how many times a 2020 unlimited season passholder actually used his or her season pass in 2020 under this formula.

Specifically, to calculate the percentage of the pass price that a single-park passholder seeks as damages, one must take the total number of expected operating days for the 2020 season for

---

[4] The current record does not indicate that there was any such surcharge.

each applicable park as the denominator. The numerator is the actual number of days the park was open.

For example, if the season was expected to be open for 100 days, and the actual number of open days was 25, then the passholder is entitled to a 75% refund of the passholder's pass price. The same formula applies for any add-ons. For those parks that never opened, passholders are entitled to a full recovery of their purchase price.

In my view, the damages model for Platinum passholders is fairly simple. The calculation is the same as that for single park passholders, except that here, the expected season should be based on the maximum number of days that any park within Platinum access was expected to be open. The "actual season" portion of the calculation should be based on the largest number of days any of those parks was actually open.

This formula benefits Defendants because it presumes that a Platinum Passholder could have used his or her pass to access any park, anywhere, when that park was open.

In reaching this result, I believe that I have adopted Plaintiffs' expert's analysis, though perhaps not expressed in the same way.

## Background

I summarize the background facts, which I have given in earlier Orders in this case. *See Cedar Fair I*, *supra*, 2024 WL 1580109; *and see Cedar Fair II, supra*, 2024 WL 301284.

Plaintiffs' 2020 season passes offered unlimited visits to Defendants' parks. Due to the COVID-19 pandemic in 2020, Defendants' parks underwent government-mandated closures for some or all of the 2020 season. Rather than refund Plaintiffs for some or all of their season pass payments, however, Defendants kept Plaintiffs' money.

6

Although all of the season passes offered the same core benefit to consumers—the promise of unlimited visits to Defendants' parks—the passes varied by park and by tier. (Doc. 77, PgID. 1316–18).

Defendants offered three tiers of passes: Regular, Gold, and Platinum. (*Id*. at fn. 5). The Regular and Gold tier passes offered unlimited visits to one park of the purchasers' choice. (*Id*. at PgID. 1316–18). The Gold pass, which cost more, included more benefits and discounts than the Regular pass. (*Id*.).

The Platinum pass, as the nomenclature suggests, was the most expensive option for a 2020 passholder. It allowed passholders' entry into any of Defendants' eleven parks. (*Id*.). It included more benefits and discounts than the Regular or Gold passes. (*Id*.).

Additionally, Regular and Gold tier pass prices varied by park.

All Plaintiffs purchased their season passes, whatever the tier or add-ons, using Defendants' websites. Defendants' park websites and purchase software was the same for all parks.

Additionally, season pass terms were the same for all parks. Those terms and conditions, however, were not readily available to purchasers for reasons I have explained in previous Orders. *See Cedar Fair I*, *supra*, 2024 WL 158109.

Once the pandemic started during the 2020 season, Defendants announced that they would not offer refunds for season passholders. Instead, Defendants announced that they would extend 2020 season passes into the 2021 season. (*See* Doc. 106 *SEALED,* PgID. 1918). After it became clear that the pandemic would significantly impair the value of the 2020 season pass this was, essentially, Defendants' take-it-or-leave-it option that they unilaterally announced.

As discussed above, I have limited the class Plaintiffs to only those passholders who did not exercise the option to visit one of Defendants' parks in 2021. In other words, the only passholders

who qualify for inclusion in the classes are those who did not accept Defendants' one-sided "offer" to carryover the 2020 pass into 2021.

For the reasons I explain below, a class action is the most appropriate way, indeed, the only practicable way, to litigate Plaintiffs' claims.

## Legal Standard

Federal Rule of Civil Procedure 23 governs class certification. Class certification is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).

Plaintiffs must show that their proposed classes meet the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and also the requirements of Rule 23(b) of predominance, superiority, and ascertainability. *See* Fed. R. Civ. P. 23; *see In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig*., 722 F.3d 838, 850 (6th Cir. 2013).

## Discussion

### a.  Defendants' Re-Litigation of OCSPA Prior Notice Issue

Defendants continue to renew arguments that I have rejected for the reasons stated when I did so. Those decisions are the law of the case. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

To be blunt: repeated efforts at bullyragging a judge once he or she makes a decision as to which he or she has considered and rejected is not appropriate. Indeed, it is never effective advocacy.

In making these remarks, I do not fault Defendants' counsel, who have often appeared before me. Instead, to the extent renewal of arguments resulted from his clients' demands I assume and I

8

believe, rightly, that the client insisted that the lawyer keep picking at, as it were, the scab of an unsightly and unwelcome decision. Repetition tires the mind and makes the heart grow firmer.

For the reasons I have already stated in both *Cedar Fair I* and *Cedar Fair II*, I reject Defendants' arguments regarding Plaintiffs' OCSPA claim. *See Cedar Fair I*, *supra*, 2024 WL 1580109; *and see Cedar Fair II*, *supra*, 2024 WL 301284.

### b.  Class Certification: Federal Law Applies

Defendants point out that, in general, under Ohio law, class certification is not appropriate in unjust enrichment claims. (*See* Doc. 64, *SEALED*, PgID. 861 ("Class action is an improper form for Plaintiffs to pursue their respective unjust enrichment claims.")). But it does not matter what Ohio does or does not allow.

The general rule under *Erie* requires federal courts to apply state substantive law and federal procedural law in diversity cases. *See Hanna v. Plumer,* 380 U.S. 460, 465 (1965) (discussing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938)).

Here, Plaintiffs' unjust enrichment claims are brought under Ohio substantive law. However, Federal Rule of Civil Procedure 23 controls the class certification inquiry. And, as aptly stated in Plaintiffs' reply brief, "there is nothing inherent in the substantive elements of unjust enrichment that makes all such claims uncertifiable under [*Federal*] Rule [of Civil Procedure] 23." (Doc. 112, PgID. 1992).

Federal courts applying Ohio substantive unjust enrichment law have accordingly treated such claims consistently with the class certification standards of Federal Rule of Civil Procedure 23. *See e.g., Kickbride v. Kroger Co.*, No. 21-cv-0022, 2022 WL 2703960, *11 (S.D. Ohio July 12, 2022) (rejecting Defendants motion to strike class allegations for unjust enrichment claims stating, "there is no prohibition [to class certification]"); *Pfaff v. Whole Foods Mkt. Grp. Inc.*, No. 09-cv-

02954, 2010 WL 3834240 (N.D. Ohio Sept. 29, 2010) (Gwin, J.) (certifying Rule 23 class for, among other claims, unjust enrichment and violation of the OCSPA); *Humphrey v. Stored Value Cards*, No. 18-cv-1050, 2018 WL 6011052 (N.D. Ohio Nov. 16, 2018) (Gwin, J.) (certifying Rule 23 class for, among other things, unjust enrichment claims).

So far as I can tell: if ever there were a case in which class certification of an unjust enrichment claim were appropriate, indeed necessary, this is the case.

### c. Class Certification: Numerosity, Adequacy of Representation, Typicality, and Superiority Are Unchallenged and Are Met

Though Defendants oppose class certification in general (*see* Doc. 106), the heart of their dispute lies in Rule 23's commonality and predominance requirements. I turn first to those aspects of Rule 23's requirements that Defendants do not dispute. I then discuss and reject Defendants' points regarding commonality and predominance.

Though Defendants do not challenge numerosity, adequacy of representation, typicality, or superiority, I must still conduct an independent analysis of whether Plaintiffs have met these certification prerequisites. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465 (2013) ("[A] court's class-certification analysis must be 'rigorous'"); *and see In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (a district judge may not "rubberstamp a plaintiffs' assertions" even where the defendant "does not contest" a Rule 23 factor).

Plaintiffs meet the numerosity requirement for both the Consumer Protection Class and sub-classes and the Equitable Claims Class and sub-classes. "When class size reaches substantial proportions, […] the impracticability [of joinder] requirement is usually satisfied by the numbers alone." *In re Am. Med. Sys., Inc.*, *supra*, 75 F.3d at 1079.

10

The undisputed data that Defendants provided to Plaintiffs in discovery indicates that the number of passholders who qualify for inclusion in one of the two main classes is upwards of 100,000. Plaintiffs clearly meet the numerosity requirement.

Plaintiffs also meet the adequacy of representation requirement. The adequacy of representation requirement calls for Plaintiffs to demonstrate that the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

This requirement contains two elements. First, that "the representatives must have common interests with unnamed members of the class;" and second, that "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524–25 (6th Cir. 1976).

The first element of the adequacy requirement, common interests, is met for both classes and sub-classes because Plaintiffs seek to hold Defendants liable for the same alleged misconduct, *i.e.*, whether Defendants' decision not to provide a full or partial refund to Plaintiffs for their 2020 unlimited season passes violates the OCSPA and/ or unjustly enriched Defendants. *See id*.

Defendants do not challenge counsel's qualifications or experience in conducting class action litigation. I have reviewed the resume Plaintiffs provided for Dovel & Luner, LLP (Doc. 76-16, PgID. 1253–93), and the declaration of Jonas Jacobson, a partner at Dovel & Luner, LLP (Doc. 76-17, PgID. 1294–96). I have also reviewed the materials Plaintiffs provided for Dworken & Bernstein (Doc. 76-18, PgID. 1301–07), and the declaration of Nicole T. Fiorelli, a partner at Dworken & Bernstein Co. (Doc. 76-18, PgID. 1298). I conclude that counsel are qualified to vigorously represent Plaintiffs' interests in this case.

Aside from all that, the vigor and quality of counsels' advocacy thus far in this case stands as irrefutable proof of their ability to handle a class action.

Defendants do not vigorously dispute that the classes and sub-classes meet both typicality and superiority.

The typicality requirement compels Plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Plaintiffs have demonstrated, at least for class certification purposes, that the representative parties for the Consumer Protection Class's claims are typified.

Specifically, named plaintiffs Holly Poteat, Jonathan Brown, Mandi Stewart, Kelly Shepperson, and Noelani Mori, fall within the Consumer Protection Class definition. Whether Defendants' decision not to refund a proportionate amount of payment to account for the days a park was closed violates the law is a question that is common and typical of all Plaintiffs.

For the Equitable Claims Class, Noelani Mori's claim is typical. Mori paid for a 2020 unlimited pass to California's Great America –one of the parks that never opened. Therefore, her claims are typical of the Equitable Claims Class members.

Additionally, the class action is unquestionably a superior, indeed the only practicable, way of litigating class members' claims in this case. Rule 23(b)(3) requires a finding "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Were I to require that hundreds of thousands of Plaintiffs litigate this same issue individually, everyone's time and resources would be wasted with repetition of the same issues, again and again, hundreds of thousands of times.

Moreover, the class action method is superior because the costs of litigating these issues individually would be prohibitive. Per Plaintiff's expert Megan Todd's affidavit, the average season pass cost is less than the cost of filing an individual complaint in federal court, much less

litigating a claim to verdict or resolution. Thus, it would be uneconomical, if not entirely prohibitive, for Plaintiffs to litigate individually.[5] (Doc. 77, PgID. 1337).

Accordingly, I find that Plaintiffs have met the Rule 23 requirements of numerosity, adequacy, typicality, and superiority.

### d.  Commonality and Predominance

Defendants more vigorously dispute that Plaintiffs have met the commonality and predominance requirements.

Notably, district court analyses of some Rule 23 requirements, commonality, typicality, and predominance, tend to "merge." *See Rikos v. Proctor & Gamble, Co.*, 799 F.3d 497, 509 (6th Cir. 2015); *and see In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 859 (6th Cir. 2013) (testing commonality and typicality against the predominance requirement and finding that liability questions "will prevail or fail in unison.").

Commonality exists for all Plaintiffs' classes and sub-classes. The commonality requirement calls for Plaintiffs to demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is satisfied when a common question "is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

To satisfy predominance, the Supreme Court explains, the proposed classes must be "sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). This inquiry "asks whether the common, aggregation-

---

[5] The filing fee in federal court is not, of course, the benchmark for class certification. It is, in any event, highly likely that the cost, even in a small claims court, where such exist, of instituting and maintaining litigation would exceed the matter in controversy between a season passholder and Cedar Fair.

enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*.

Plaintiffs meet the commonality and predominance requirements. A, if not *the*, ultimate question for all Plaintiffs is the same: whether Defendants' decision not to refund (in full or in part) purchasers of 2020 unlimited season passes violates the law.

Defendants argue that individual issues, such as, for example, pass usage in 2019 and 2020 make the inquiry too individualized for there to be common and/or predominant questions. I have already addressed, and rejected, these arguments. As I stated above, whether an early bird purchaser used his or her 2020 season pass in 2019 has no impact on the fact that the passholder paid in full for the 2020 season, which Defendants failed to deliver (in full or in part).

Moreover, as discussed, for Consumer Protection Class Plaintiffs, the number of times a passholder visited a park has no bearing on the fact that Defendants unilaterally shortened the number of days a plaintiff could use his or her pass.

Defendants also argue that passholders who purchased add-ons, used Easy Pay, and/or purchased differently-tiered passes for different parks make these passholders' claims too individualized to meet Rule 23's certification requirements. Not so.

That there may be some issues requiring individual scrutiny and/or categorization of Plaintiffs does not defeat certification, particularly where these individualized issues do not outweigh the common issues in this case.

As I discussed, these individual differences are easily addressed through Rule 23 classes and sub-classes. Moreover, all individualization is readily ascertainable through Defendants' own records of who purchased what, and how much that purchaser spent.

14

The difficulty for the parties, if any, will lie in the work that needs to be done applying the formulas I have set forth. However, those application and qualification logistics are true in nearly every class case.

Here, I am confident that the classes and sub-classes I am establishing overcome these differences.

### e. Mandi Stewart as Next Friend of Her Daughter

I do not find that Mandi Stewart should be stricken as a class representative due to lack of standing, as Defendants urge. (*See* Doc. 105, PgID. 1659–60). Mandi Stewart purchased a pass on behalf of her then-minor daughter, Arianna Stewart. (Doc. 112, PgID. 1996–97).

Defendants had no problem that I am aware of locating and producing Mandi Stewart's purchase records in discovery. Both parties clearly understood Mandi Stewart's capacity as a purchaser of her daughter's pass. Defendants have not been unfairly prejudiced by Mandi Stewart's participation in this case and their arguments otherwise lack merit.

Plaintiffs are granted leave to forthwith take any necessary and appropriate steps to amend the caption of this lawsuit to reflect Mandi Stewart's capacity as next friend.

### f. Canadian Park Passholders

I reject Defendants' argument that the Canada's Wonderland passholders do not have commonality with United States park passholders. (Doc. 105, PgID. 1639). Defendants' concern is mainly that Canadian courts adjudicating similar issues brought by Canadian park passholders would not be bound by *res judicata* principles to any United States' court rulings. This argument is entirely speculative.

Indeed, as Defendants oft repeat in their briefs, the parties have stipulated that Ohio substantive law—not Canadian law—applies to all passholders' claims. (*See* Doc. 27).

15

Moreover, the parties could stipulate that any Plaintiff who recovers in this lawsuit agrees not to seek reimbursement in the Canadian courts. In effect, it's a practical opt out.

I therefore reject this argument against certification.

## Conclusion

It is, therefore, ORDERED THAT:

Plaintiff's Motion for Class Certification (Docs. 76, 77) is granted subject to the amended class and sub-class definitions I have described above.

The Clerk shall forthwith schedule a status and/or scheduling conference.

SO ORDERED.

DATE: 9/24/2024                                              /s/James G. Carr
                                                            Sr. U.S. District Judge

16